**NEW ENGLAND WOODEN WARE**
v.
**UNITED STATES.**
Civ. A. No. 67–99.

United States District Court
D. Massachusetts.
Aug. 29, 1968.
As Amended Aug. 30, 1968.

Gael Mahony, Joseph D. Steinfield, J. Daniel Sagarin and Hill & Barlow, Boston, Mass., for plaintiff.

Herbert Grossman, Dept. of Justice, Paul F. Markham, U. S. Atty., and Joseph A. Lena, Asst. U. S. Atty., for defendant.

## OPINION

WYZANSKI, Chief Judge.

This is an action to recover income taxes collected from New England Wooden Ware Corporation for the three fiscal years ending April 30, 1962, 1963, and 1964. The issue is whether, as the language of § 532 of the Internal Revenue Code of 1954 provides, that corporation was "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed."

In May 1929, to centralize control of certain of their operations in the manufacture of wooden pails and tubs, 3 independent enterprises manufacturing wooden ware products united to form plaintiff taxpayer. New England Box Company transferred its plant in Swanzey, New Hampshire to the taxpayer; E. Murdock Inc. (which had grown from a business begun in 1834 by an ancestor of William W. Whitney) in return for plaintiff's stock, transferred to it a plant in Winchendon, Massachusetts; and Menasha Wooden Ware Company of Wisconsin, also in return for plaintiff's stock, transferred to it the Keene, New Hampshire plant of a Menasha affiliate, Keene Wooden Ware Company.

In 1946, the market for wooden pails and tubs having declined, plaintiff sold the Keene plant and used the proceeds towards conversion of the Winchendon plant from the manufacture of wooden pails to the manufacture of corrugated boxes. Later plaintiff sold its Swanzey plant. Those sales followed extensive discussions by directors.

At all material times after 1946, 1,535 of the 3,000 shares of plaintiff's stock have been held by or for the benefit of the Whitney family, and the remaining 1,465 shares by the Menasha company. Responding to their stock interest, the Whitneys have filled 3 of the 6 directorships, and Menasha the other 3. The most prominent and influential Menasha director has been Mowry Smith, a chief managing officer of Menasha. It was at his urging, and based on his experience at Menasha, that plaintiff converted to corrugated box manufacture.

During the directors' discussions preceding plaintiff's entry into the corru-

gated box business, all directors showed awareness that wooden ware manufacture was no longer profitable for plaintiff. Indeed in 1946 plaintiff lost $39,000, and the directors feared that the downhill trend would lead to liquidation, if not insolvency. The directors resolved on September 15, 1947 that "The Corporation is faced with complete liquidation in the near future, or entering into another line of business."

Deciding to manufacture corrugated boxes, plaintiff immediately used its $106,000 profit from sale of the Keene plant. Then in June 1949, plaintiff's directors decided it needed additional capital of over $300,000. By April 30, 1954 plaintiff had invested more than $322,000 in its corrugated box department. Most of this money came from loans by its stockholders. In 1956 the borrowing had created a then debt of $198,000. All the borrowings were not repaid until the year ending April 30, 1961.

At all times, both before and during the taxable years, plaintiff's directors not only in form but in substance voted unanimously, and in particular William Whitney and Mowry Smith consulted orally and in writing with frequency to make certain that with respect to all action and inaction, including dividends in particular, there was a perfect meeting of the minds. Innumerable letters attest convincingly to this genuine mutuality, in no sense feigned to deceive others, or achieved out of deference or subservience to conciliate one another. One illustrative example is that in considering dividend action in the spring of 1961, the Menasha directors favored $15,000 and persuaded the Whitney directors to vote that amount rather than $9,000.

There is ample evidence that both the Whitney and Menasha interests were mindful of, and thought of benefitting from, Menasha's own experience in expanding in corrugated box manufacture, sheet plants, paper-board plants, a plywood plant, a wood floor plant, owner-ship of timber land, and the plastics industry. Also all plaintiff's directors were conscious of plaintiff's "cellar position" with respect to other box manufacturers in New England, and to plaintiff's national competition from concerns as widely known as Container Corporation, International Paper, West Virginia Pulp & Paper, St. Regis, and Union Bag.

In a letter to Smith in early 1961 Whitney expressed his views about what should be done with the plaintiff's earnings: "I personally do not get any particular benefit out of retention of earnings, although I admit liking a substantial bank balance; but if the business stands still it goes back. If it has money enough to expand, it is far more apt to do more than if it has to borrow money for such expansion. New England Wooden Ware is mighty small in the box business, and unless it is plenty strong financially, it would not take competition very long to put us out of business" (Ex. 1, letter of January 27, 1961).

A few months later Whitney wrote again about the need for growth, asking for Smith's advice: "A considerable while ago, you wrote me a letter asking what my plans were for New England Wooden Ware. I cannot remember what I answered you, but I think I said I wanted to get out of debt and expand the business. You did not criticize me for this ambition. Now I would like to ask you what New England Wooden Ware should plan to do, now that we are out of debt, but have not expanded very much" (Ex. 1, letter of May 21, 1961).

A month later Whitney wrote again about the same subject: "We for so long made no progress in the pail business, that it is the last thing I want to do now, if I can help it. I sincerely believe that if one stands still, he is going back. I should in some way increase sales. Menasha Wooden Ware has been able to do it, and I need help to do it here" (Ex. 1, letter of June 23, 1961).

The correspondence between Whitney and Smith specifically considers the pos-

sibility of plaintiff's expansion, like Menasha's, into the plastic business. As a result of these discussions Whitney traveled to Watertown, Wisconsin, in December, 1961, and examined the G. B. Lewis Company plant (Ex. 1, letters of December 22, 27, 1961, February 2, 5, 8, 12, 1962). In the spring of 1962 one of Smith's sons came to Winchendon and spent ten days visiting various local companies with Whitney to determine what the market was for plastics in New England (Ex. 1, letters of February 21, April 13, 1962; report of April 18, 1962).

In the summer of 1962, with the approval of the plaintiff's other directors, Whitney made arrangements to have the well-known firm of Arthur D. Little, Inc. of Cambridge make a study of how the plaintiff could best enter the plastics industry. After a preliminary consideration of reinforced plastics, of the type manufactured by G. B. Lewis Company, Jenest of Arthur D. Little, Inc. reported that reinforced plastics was not a promising product opportunity for the plaintiff. The product that Jenest did recommend for further detailed study was a spiral wound fibre paint can with a plastic liner. There were two principal reasons for exploring this product opportunity: first, spiral wound fibre cans were being used successfully to package other liquid products, such as orange juice and motor oil; and, second, a substantial portion of the plaintiff's customers for corrugated boxes were in the paint industry and would therefore constitute an established clientele for the sale of paint cans. After Jenest had completed a market study for the paint can, the matter was transferred within Arthur D. Little, Inc. to Squibb, whose specialty was engineering. Squibb made studies of what the production problems would be in manufacturing the paint cans, and went so far as to produce a series of prototype cans. In December, 1963 Squibb submitted a report (Ex. 2) in which he estimated that an investment of $610,000 to $820,000 would be required to enter the business of manufacturing spiral wound paint cans. Although Whitney was willing to explore the matter further (Ex. 1, letters dated January 22, 29, February 3, 22, 1964) as recommended by Squibb, Smith and the other directors from Menasha were strongly opposed to the continuation of the project, principally because of the size of the capital requirement as estimated in Squibb's report (Ex. 1, letters dated January 28, February 3, 5, 8, 22, 25, 1964). Accordingly, because of the opposition of the Menasha directors, the paint can project was discontinued.

Also in 1964 Whitney wrote to a fellow director, Richard L. Johnson, Menasha Corporation's president, "I also see occasionally things that indicate that plastics offer pretty severe competition to corrugated boxes in the future. Of course, it would be ideal to combine the two industries."

Other possibilities than plastics and paint cans were explored as avenues of potential expansion. For example, at Smith's suggestion in 1963, Whitney investigated possible purchases of paper mills in North Wilbraham and Lawrence. Also Whitney explored, with the aid each time of Arthur D. Little, Inc., the profitability of entering upon the manufacture of molded pulp products, or upon the manufacture of meat and produce trays and egg boxes from thermoformed foam styrene sheets.

Each of the diversification possibilities explored by the plaintiff reached the stage of a clear definition of the product (including the making and testing of prototypes in the case of the paint cans and the molded pulp containers) and a detailed study of market potential and production feasibility. In each case the plaintiff engaged the services of Arthur D. Little, Inc., a leading consulting firm, and paid for these services, in the aggregate, more than $27,000.

1961 was the first year of substantial corporate profits. That year $148,000

was earned. In the years 1948–1954 the earnings had varied between $4,000 and $28,000; in 1955 there was a loss of $66,000; in 1956 a profit of $3,000; and in 1957–60 there were small annual profits.

In the three taxable years now in issue, 1962, 1963, and 1964, respectively, the taxable income, in thousands of dollars, were $346, $331, and $323, and the income after taxes, in thousands of dollars, were $174, $166, and $155, and the amount available for distribution of dividends, in thousands of dollars, were $164, $164, and $160. In those years, respectively, the corporation paid as dividends, in thousands of dollars, $60, $30, and $120 (leaving as accumulated taxable income $114, $134, and $40).

At the end of the 3 taxable years, respectively, the corporation had in cash on hand, bank notes, and United States tax notes (collectively referred to as cash), in thousands of dollars $438, $527, and $532.

At the end of the 3 relevant years, taxpayer's current assets and liabilities were:

| Current Assets | 1962 | 1963 | 1964 |
|---|---|---|---|
| Cash | $438,174.30 | $527,770.07 | $ 532,716.72 |
| Government Obligations | — | | |
| Notes and Accounts Receivable | 203,867.92 | 194,617.42 | 182,748.19 |
| Inventories | 276,569.87 | 265,930.00 | 346,039.65 |
| Prepaid Expenses | 3,827.11 | 3,074.69 | 4,177.56 |
| Total Current Assets | $922,439.20 | $991,392.18 | $1,065,682.12 |
| Current Liabilities | | | |
| Accounts Payable | $ 6,412.23 | $ 11,406.13 | $ 35,860.55 |
| Bonds, Notes, and Mortgages Payable (Maturing Less than One Year) | | | |
| Accrued Expenses | 53,063.65 | 51,229.86 | 48,905.07 |
| Accrued Federal Income Taxes | 174,198.46 | 128,208.81 | 121,811.65 |
| Total Current Liabilities | $233,674.34 | $190,844.80 | $ 206,577.37 |

We turn now to the attitudes and motives of plaintiff's directors as revealed in the written evidence and in the especially persuasive oral testimony given *ore tenus*. Both the Whitney faction and the Menasha faction wrote to each other with complete candor their several, and sometimes varying, attitudes on dividend questions. Neither overbore the other. Neither sought a selfish advantage. Both were primarily concerned with the normal growth of a business in which both had interests and which had a history showing the need of large-scale preparations to meet major changes in technology and consumer demand. Each of the principal directors, Whitney and Smith, were men of prudence and sound business judgment. Although Whitney was old, he remains in 1968 as he must have been half a dozen years ago, (during the taxable period), alert, vigorous, clear, credible, and convincing. The Government's suggestion that he was old, tired, and without venturesomeness reveals a failure to understand a typical Yankee. An appellate court will grasp the reality if he be compared to the cartoonists' stock figure of Uncle Sam.

Like Uncle Sam, of course, Whitney consulted others. He received from the accountants Tupper, Moore & Co. a letter dated July 13, 1960 noting the possibility of an accumulated earnings tax

being imposed upon the corporation. The accountants wrote that "It would be helpful, too, if at the, say, April 1961 Board of Directors' meeting some comment on company dividend policy were included in the minutes together with a statement of the reasons (as specific as possible) for retaining earnings in the corporate treasury. It is essential to review these comments once a year and to incorporate revisions of them in the Board's minutes so that time and events will not render obsolete reasons given for retaining earnings." The foregoing sound advice was followed by Whitney. Nothing in the accountants' letter, or the reaction of Whitney, or his correspondence with Smith, suggests a false façade, a canny conspiracy to cheat the revenue. On the contrary, the object was to make explicit what was implicit in the dividend policy of the taxpayer.

The Government implies that Whitney, Smith, and the others interested in the taxpayer were not in good faith when they sought the advice of Arthur D. Little Co., and that the search for new projects made by Little was amateurish, incomplete and unrealistic because unrelated to the practical investment policies and desires of the Whitneys. The charge is absurd. What plaintiff paid Arthur D. Little Co. for its advice was not a small percentage of the increase in federal taxes which would have been consequent on larger declarations of dividends by plaintiff. The methods Little followed showed the imaginativeness, intellectual depth, and integrity which have won that firm its high place as a consultant for the federal government itself as well as for private organizations. That Little has not turned up, so far, a project both of sufficient merit and of a magnitude not beyond plaintiff's resources is unfortunate, but not indicative of bad faith, want of motivation, or insincerity of the ever-present expansionist views held by all plaintiff's directors. A company that is prudently expansionist need not be aggressively expansionist in order to satisfy a trier (at least in New England) that it means to keep its place in the business sun.

In short, Whitney has persuaded this Court that he, Smith, and the other directors acted like cautious, prudent Yankees who had seen a near-disaster from the decline of the wooden pail manufacturing industry, and who were determined to keep expanding the taxpayer's business in new directions both to maintain and, if possible, to increase normal profits and also to fend off competitive attacks by giant corporations in the same line of business.

At the same time, as he wrote Smith, Whitney was mindful of the wish of his sister, with whom he was on good terms, to receive generous dividends, and he also had no objection to receiving generous disbursements on his own stock.

Moreover, from their interest in Menasha Wooden Ware Company of Wisconsin, Smith and other Menasha directors wanted as much cash from plaintiff for Menasha's other enterprises as could be prudently distributed. But emphasis was always on how far a distribution by plaintiff was prudent and in accordance with sound business judgment. And Menasha's own experience reminded its company's representatives of the necessity of plaintiff constantly looking for new fields for expansion in order to reduce its vulnerability to changes in customer preference, in market conditions, and competitive rivalry.

We now make a series of economic findings which prior cases show have been regarded by some courts as relevant and even determinative. Although, as will appear, this Court does not find it necessary to invoke those findings as

either a principal or even as a corroborating support for its legal conclusions, the findings may serve the purposes of an appellate court and perhaps even avoid a remand.

The evidence shows the following relation between operating costs for the business cycle and net liquid assets, for the fiscal years ending in 1962 through 1967:

| | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|---|---|
| Operating cost for the business cycle | $573,142 | 592,048 | 698,678 | 767,038 | 856,309 | 944,138 |
| Net current assets | $688,765 | 800,547 | 859,105 | 947,487 | 988,829 | 930,031 |
| Excess or (shortage) of net liquid assets in relation to operating costs | $115,623 | 208,499 | 160,427 | 180,449 | 132,520 | (14,107) |

Thus, the excess of net liquid assets over working capital needs has varied during this period from a positive figure of $208,499 to a negative figure of $14,107. The average excess for the six year period is $130,570.

If the percentage of the year represented by the operating cycle (which, in the typical year 1962 was 3.61 months, or 30.1% of a year) is applied against the operating costs of the following year, the excess of net liquid assets over working capital needs is less; and the deficiency of net liquid assets for the year ending in 1967 increases to $151,254.

When the average expenditure for capital improvements of $95,290 (for the years ending in 1962 through 1968) is deducted from the average excess of net liquid assets over working capital needs of $130,570 (for the years ending in 1962 through 1967) the average net free liquid assets is reduced to $35,280; and this figure provides no allowance for the plaintiff's plans to expand and diversify.

The plaintiff could reasonably, on the basis of Jenest's expert advice, anticipate an initial expenditure of at least $100,000–$200,000 to enter some new product field and seriously considered proposals that would require capital investment ranging from $275,000 to $400,000.

We turn now from the facts to the legal conclusions appropriate in this case. §§ 531, 532, 533, and 537 of the Internal Revenue Code of 1954, so far as applicable, read as follows:

"SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax * * *.

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) *General Rule.*—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection(b))

formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

\*   \*   \*   \*   \*   \*

### SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) *Unreasonable Accumulation Determinative of Purpose.*—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

\*   \*   \*   \*   \*   \*

### SEC. 537. REASONABLE NEEDS OF THE BUSINESS.

For purposes of this part, the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

Treas. Reg. § 1.537–1(b) provides as follows:

"(b) *Reasonable anticipated needs.* (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations."

The principal relevant earlier opinions are Apollo Industries, Inc. v. C. I. R., 1 Cir., 358 F.2d 867; Young Motor Co., Inc. v. Commissioner of Internal Revenue, 1 Cir., 281 F.2d 488; Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 4 Cir., 241 F.2d 197; and Bardahl Mfg. Corp. v. Commissioner, T. C. Memo 1965–200, CCH Tax Ct.Mem., Dec. 27, 494(M).

Those authorities disclose that there is no single approach which the statute and regulations, as interpreted by the courts, "sanctify \* \* \* as applicable to all cases", (to quote Judge Coffin in Apollo, 358 F.2d (at p. 872). There is not a governing mathematical formula. Not "general observations"

but specific analysis of the particular facts governs. All relevant factors must be considered. But, of course, as Justice Frankfurter used to say, there is no democracy in the world of facts. Some facts are major. Others, even if relevant, are minor. A good opinion keeps to the major facts (though to satisfy some appellate courts, trial courts must pile Ossa upon Pelion, and sadly unlearn what Learned Hand taught—the courage that dares to rest a case upon its strongest point, and so avoids that appearance of weakness and uncertainty which comes of a clutter of arguments. See L. Hand, The Spirit of Liberty, Vintage Books, N.Y.1959, p. 98).

 Here the major fact is that such earnings and profits as were accumulated were for reasonably anticipated future needs.

The taxpayer had specific, definite, and feasible plans for the use of such accumulation. This appears in the plaintiff's pattern of following Menasha, though at necessarily shorter steps, in its expansionist program to counterbalance alterations in consumer demand and challenges from technological developments.

It was the intent of plaintiff's directors to use such accumulation within a reasonable time, as shown by the facts and circumstances relating to the future needs of the business. Particular attention is directed to the earlier findings with respect to the history of plaintiff, the expansionist policies of its directors, their *bona fide* search (with the extensive aid of a disinterested, noted business consultant) for new projects, and the readiness of all the directors to act at the time appropriate in the light of competition.

No subsequent events disprove this intent.

Consummation of this intent is reasonably foreseeable and would be an exercise of sound business judgment apart from all tax-avoidance considerations.

The directors were not motivated by an intent to avoid taxation in order to benefit the corporation or its shareholders. Their intent was *bona fide* to maintain and advance the business of the plaintiff corporation not to further the personal interest of some stockholder, dominant or otherwise.

Plaintiff shall submit to the Court and defendant, by September 3, 1968, a precise accounting of the amount that will be due it with interest to September 10, 1968. Defendant may submit to the Court and to plaintiff no later than September 10, 1968 any error in the accounting. Then there shall be entered

Judgment for plaintiff.