EDWARD B. WOLF, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edward B. Wolf, Inc. v. Commissioner
Docket No. 29380-83.
United States Tax Court
T.C. Memo 1987-562; 1987 Tax Ct. Memo LEXIS 554; 54 T.C.M. (CCH) 1053; T.C.M. (RIA) 87562; November 9, 1987. Murray H. Falk, for the petitioner. Phoebe L. Tang, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency in Federal income tax for petitioner's taxable year ended June 30, 1981, in the amount *556 of $ 16,258. The sole issue for decision is whether petitioner is liable for the accumulated earnings tax imposed by section 531[1] for its fiscal year ended June 30, 1981. FINDINGS OF FACT Some of the facts in this case are stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioner, Edward B. Wolf, Inc., was a California corporation with its principal place of business in Encino, California, at the time it filed the petition. Petitioner maintains its books of account and files its Federal income tax returns on the accrual basis of accounting and has adopted a fiscal year ending June 30. Petitioner was incorporated in 1954 to engage in the transportation of liquid feeds for cattle and the brokerage of cattle feed-lot fats and tallow. Petitioner succeeded to the business commenced by Edward Wolf (Mr. Wolf) and his wife Harriet Wolf (Mrs. Wolf) in California in 1946. From its incorporation until 1977, petitioner's principal place of business was located in Carson, California, *557 and consisted of land and buildings which it leased from Mr. and Mrs. Wolf. Mr. Wolf owned all of the outstanding capital stock of petitioner from 1954 until his death in 1970. During this period he served as President and a director of petitioner. Mrs. Wolf, also an officer and director during this period, participated in the business of petitioner since its inception. Following the death of Mr. Wolf, Mrs. Wolf became the sole shareholder and President of petitioner. Jack Cohen (Cohen), a certified public accountant and petitioner's accountant since the late 1960's, became Treasurer and a director of petitioner. The officers and directors operated petitioner in an informal manner and did not keep written minutes of its corporate activities. As president, Mrs. Wolf managed petitioner's daily business operations and was responsible for all corporate decisions. She consulted Cohen on the corporation's financial matters. During 1974, Mrs. Wolf learned that the City of Carson intended to take by eminent domain the real property from which petitioner operated its trucking business. On April 6, 1977, in anticipation of the condemnation proceedings, petitioner sold the operating *558 assets of its business (the equipment) to Bulk Transportation, Inc. for $ 445,000. Of this sum, the amount of $ 405,339.20 was payable by a promissory note (the note), due in monthly installments to begin in June 1977 and end in June 1984. The note was secured by the equipment, and petitioner maintained a security interest in the equipment pursuant to California commercial law. Petitioner placed the installment sale proceeds and all corporate funds in petitioner's checking account. It then transferred funds by corporate checks to certificates of deposit for terms of 90 days or less, some bearing interest at as much as 15 percent per annum. At the end of the terms, certificates of deposit were usually renewed for additional periods not exceeding 90 days. From June 30, 1977, to December 1980, petitioner was relatively inactive. Its primary activities consisted of seeking new businesses in which to engage, collecting payments from the installment sales note, collecting residual commissions earned on brokerage contracts retained from the trucking business, and collecting interest earned on its certificates of deposit. During 1980 Mrs. Wolf decided to engage petitioner in the *559 retail handbag business. Mrs. Wolf had some familiarity with the women's handbag business; her family had been in the business of manufacturing handbags and she had worked in bookkeeping for a large handbag manufacturer after graduating from college. Petitioner planned to purchase certain eastern-style, custom-made handbags from New York and sell then at discount, initially from Mrs. Wolf's Encino residence and ultimately from a store. Mrs. Wolf discussed her plan in the fall of 1980, during the tax year in issue, with two individuals -- an acquaintance who operated a retail handbag, accessory and jewelry business in New York, and Cohen. Mrs. Wolf and Cohen discussed only in general terms how the business should be funded. Cohen advised Mrs. Wolf to proceed cautiously with the handbag business and to spend initially up to $ 2,500 on handbags. At that time neither Mrs. Wolf nor Cohen had any idea how much capital would be required for the first year of operations or for any subsequent year. Mrs. Wolf never asked Cohen to prepare forecasts or projections of petitioner's sales. In December 1980 Mrs. Wolf purchased in New York the first handbags for petitioner's new business. *560 The order amounted to $ 5,000. Petitioner then began to operate its retail business from Mrs. Wolf's personal residence, advertising by mail to Encino residents. During the year in issue, petitioner extended a personal loan to Mrs. Wolf in the amount of $ 7,500, which was paid out of its checking account. The loan was not reflected in a promissory note. Mrs. Wolf repaid petitioner $ 5,500 without interest in the fiscal year ended June 1983 and repaid the $ 2,000 balance without interest in the fiscal year ended June 1985. In June 1981, the last month of the taxable year in issue, petitioner moved its retail business from Mrs. Wolf's residence to approximately 200 square feet of a retail kitchen goods shop in Tarzana, California. Petitioner leased this space on a month-to-month basis without a written lease agreement for the sum of $ 300 per month. Prior to leasing this space, Mrs. Wolf and Cohen did not discuss the amount of capitalization the business would require in the new setting, and Mrs. Wolf did not know how much inventory petitioner would require. As of June 30, 1981, the close of the taxable year in issue, petitioner had retained earnings in the amount of $ *561 406,611. Petitioner's taxable income for the year was $ 76,450, and net sales from the retail operation for the year were $ 32,739. Petitioner paid Mrs. Wolf a salary of $ 12,000 during the year. Approximately $ 251,264 remained to be paid on the note of Bulk Transportation, Inc. There were no discussions among petitioner's officers and directors as to whether a dividend should be declared during its fiscal year ending June 30, 1981. Following the tax year in issue, petitioner explored new approaches to operating its handbag business. In September 1981 petitioner placed some handbags on consignment with an existing store in Bel Air, California. Petitioner received in return a 10-percent commission on the sale of the handbags. The arrangement was to be the first step in an overall plan to consign handbags to several stores. Petitioner discontinued this arrangement and plan in June 1982 because of disappointing results. In January 1982 petitioner moved its retail operations to approximately 400 square feet (200 in selling space and 200 in storage) in an existing retail knit shop in Encino. With this move petitioner added belts to its inventory of handbags. During 1982, *562 Cohen began his representation of petitioner in respondent's audit of petitioner's corporate tax return for its fiscal year ending June 30, 1981. In an October 23, 1982, letter to respondent, Cohen described petitioner's plans for the use of its accumulated earnings as follows: The primary activity of the corporation is the retail sale of women's handbags, belts, small leather goods and accessories. * * * The plans for the use of the corporate accumulated earnings are in a developing stage. Different approaches have and are being examined, and some are being implemented in a deliberate and careful fashion. Initially, it was contemplated to have women selling to their friends and neighbors from their own homes, somewhat like the Amway process. Many efforts were made in that direction until they ran into a formidable obstacle: quality product manufacturers would not ship handbags to individual homes. In July of 1981, probing a different approach, space was subleased in NOW YOU'RE COOKING at 18369 Ventura Boulevard in Tarzana. The logic of this approach to be tried was that if an existing retail shop of non-competing items could be found on which the handbag and accessory *563 business could piggy-back, taking advantage of an existing flow of shoppers, then the process could be repeated in many carefully chosen areas. Connections were meanwhile being made and tried with outstanding manufacturers like Opulent Containers of Michigan, Tiana of New York, Mylink of New York, Zushi of Rockaway, N.Y., and Maurizio de Giacomo of Florence, Italy. When the selling approach did not result in an encouraging volume, it was perceived that the number of shoppers alone was not the criterion for success. It was the economic situation of the buyer that determined the "right clientele." Crowds of shoppers who were not in the market for high quality, expensive merchandise at a discount were definitely not the "right clientele." Consistent with that view, two parallel approaches are currently being tried to arrive at the elusive method that would ensure success. One is that a new place has been leased in Encino in conjunction with a higher economic level knitting shop (Myrna's Place) that caters to fashion-conscious women who can afford luxury items; and secondly, handbags and belts are being placed in carefully selected Bel-Air boutique on consignment (The Ultimate *564 Collection). * * * Although additional locations are being considered, in the Sacramento, Los Angeles, and Orange County areas, it is being done with great deliberation and care because of the depressing current economic situation. Cohen wrote respondent a second letter dated December 17, 1982, regarding petitioner's plans for the use of its accumulated earnings. This second letter stated, in part: As pointed out in our recent telephone conversation, the taxpayer is a solely-owned corporation, run by Mrs. Wolf, with no other employees or shareholders with whom she need consult. Consequently, Mrs. Wolf operates the business as if it were a sole proprietorship -- which ultimately it is equivalent to. Larger and more usual corporate entities require decisions by committees and groups of people, entailing thereby the need of written and more formal recordation of correspondence, consultation, planning, cost estimates, and other indicia of a team or group effort. This imperative does not here exist, and consequently an effort to assess the taxpayer's operational methods by a yard stick appropriate to more conventional corporations is not a valid or accurate gauge to ascertain *565 whether this taxpayer does indeed have business plans of development to justify the husbanding of its funds. In consequence, your queries regarding specific amounts required for fixtures, inventory, start-up costs, working capital, etc. can not be validly determined because the precise mode and locations of operations cannot be ascertained at this time. The taxpayer is still trying and testing various options deemed available, and the whole development is far from being finally conceptualized. As an indication of this, Mrs. Wolf spent the week before this on a buying trip in New York where she sought out an attractive new line of women's hosiery which she will now merchandise in additional space at her present location. She will also be looking for new additional space, after the current holidays, in the Beverly Hills area. Here too the location, such as proximity to Rodeo Drive, and nature of the space will determine not only the rental cost, but also the related costs of fixturization, inventory, working capital, etc. Throughout its corporate existence, petitioner paid no dividends except during its fiscal year ending in 1983, when it paid a dividend in the sum of $ 25,000 *566 to Mrs. Wolf. On July 14, 1983, respondent sent a section 534(b)[2] notification by certified mail informing petitioner that a proposed statutory notice of deficiency included an amount with respect to the accumulated earnings tax for the taxable year ended June 30, 1981. Petitioner did not submit a section 534(c) statement of the grounds upon which it relied to establish that all or a part of its earnings and profits for the taxable year ending June 30, 1981, were not permitted to accumulate beyond the reasonable needs of its business. *567 On September 19, 1983, respondent mailed petitioner the notice of deficiency in this case. In the latter part of 1983, Mrs. Wolf decided to expand petitioner's business to include the retail of women's clothing. Shortly thereafter petitioner placed its first clothing order, to be delivered in 1984. Early in 1984, petitioner increased its square footage at the Encino shop to approximately 650 square feet of selling space and 150 square feet of storage space. The space was leased for $ 1,000 per month. During the fall of 1984, petitioner placed its first order with Mondi of America (Mondi), a ladies apparel company. Between that time and the trial of this case in March 1987, particularly after 1986, Victoria Todd (Todd), a Mondi's regional sales manager, began assisting Mrs. Wolf with purchasing and general retail matters. Todd also advised Mrs. Wolf regarding various expansion proposals for petitioner's retail business and the specific capitalization requirements of a larger high fashion women's merchandise store. After 6 years of operations in the retail sales business, petitioner's 1986 calendar year dollar volume was approximately $ 300,000. As of the date of the *568 trial, petitioner's retail operations remained in the 800 square-foot shop which it moved into in 1984. Financial Data
Petitioner did not prepare balance sheets or profit and loss statements for its fiscal years ended June 30, 1980, through June 30, 1986, other than as shown on its tax returns for those years. Petitioner's retained earnings and taxable income for its fiscal years ended June 30, 1974, through June 30, 1986, were as follows: Year
Retained Earnings
Taxable Income
1974
$ 137,078
$ (11,675)
1975
186,651
61,847 1976
237,137
60,566 1977
253,158
37,688 1978
267,280
20,872 1979
302,603
43,927 1980
347,430
54,615 1981
406,611
76,450 1982
479,235
98,975 1983
525,056
94,654 1984
604,981
109,781 1985
632,823
33,039 1986
656,639
28,280 Petitioner's net liquid assets (current assets less current liabilities) for its fiscal years ended June 30, 1981, through June 30, 1986 (not including any amounts due on the Bulk Transportation, Inc., promissory note) were as follows: *569 Years Ended
1981
1982
1983
Current Assets:
Cash
$ 336,042
$ 418,945
$ 504,229
Inventory
7,917
15,420
10,842
Other current assets
4,248
8,000
10,400
Total current assets
$ 348,207
$ 442,185
$ 525,471
Less Current Liabilities:
Accounts payable
$  10,986
$  12,155
$  21,510
Other current
liabilities
10,060
7,779
833
Total current
liabilities
$  21,046
$  19,934
$  22,343
Net Liquid Assets
$ 327,161
$ 422,251
$ 503,128
1984
1985
1986
Current Assets:
Cash
$ 613,598
$ 611,733
$ 654,371
Inventory
26,950
31,449
15,239
Other current assets
8,600
5,303
2,150
Accounts receivable
14,243
599
1,760
Total current assets
$ 663,391
$ 649,084
$ 673,520
Less Current Liabilities:
Accounts payable
$  37,474
$   4,915
$   4,788
Other current
liabilities
7,356
0
0
Total current
liabilities
$  44,830
$   4,915
$   4,788
Net Liquid Assets
$ 618,561
$ 644,169
$ 668,732
The gross receipts, costs of goods sold, gross profits, deductions, and net income attributable *570 to petitioner's retail sales business were as follows through June 30, 1986: Years Ended
1981
1982
1983
Gross receipts
$  32,739 $ 109,066 $ 178,876 Less cost of goods sold
24,961 82,796 127,924 Gross profits
$   7,778 $ 26,270 $  50,952 Less deductions
22,805 30,500 46,206 Net income (loss)
$ (15,027)
$ ( 4,230)
$   4,746 1984
1985
1986
Gross receipts
$ 285,249 $ 246,725 $ 298,568 Less cost of goods sold
192,978 209,648 248,374 Gross profit
$  92,271 $  37,077 $  50,194 Less deductions
72,511 41,510 56,053 Net income (loss)
$  19,760 $ ( 4,433)
$  (5,859)
Petitioner purchased inventory for its retail sales business in the amounts shown below in the years indicated: Year Ended
Inventory Purchases
1981
$  32,878
1982
90,119
1983
123,526
1984
209,086
1985
214,147
1986
232,164
For its fiscal years ending June 30, 1981, June 30, 1982, and June 30, 1983, petitioner's inventory purchases were all attributable to handbags and accessories. For its fiscal year ending June 30, 1984, $ *571 123,526 of petitioner's purchases was attributable to handbags and accessories, while $ 85,560 was attributable to clothing. For its fiscal year ending June 30, 1985, one-half of petitioner's purchases was attributable to clothing. For its fiscal year ending June 30, 1986, more than one-half of petitioner's purchases was attributable to clothing. OPINION The Code has long contained provisions designed to discourage accumulation of corporate earnings not needed in the conduct of a business. See sections 531 through 537; United States v. Donruss Co.,393 U.S. 297, 303-307 (1969). With exceptions not applicable here, section 532 applies the accumulated earnings tax to "every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." Tax avoidance need not be the sole or even the dominant purpose for the accumulation; shareholder *572 tax avoidance may be but one of several purposes. United States v. Donruss Co.,393 U.S. at 307-309. Because of the difficulty of ascertaining corporate motives for accumulation, the tax law emphasizes unreasonable accumulation as the primary factor in the incidence of the accumulated earnings tax. United States v. Donruss Co.,393 U.S. at 307. Section 533(a) provides that a corporation that accumulates earnings and profits beyond its reasonable needs presumptively does so for the proscribed purpose of tax avoidance with respect to its shareholders. This presumption is rebuttable, however, by a preponderance of evidence to the contrary. The accumulated earnings tax is not imposed therefore where a corporation has made an unreasonable accumulation but lacks the proscribed purpose. Section 1.533-1(a)(2), Income Tax Regs.; Snow Mfg. Co. v. Commissioner,86 T.C. 260, 269 (1986). Whether the corporation has accumulated its earnings and profits beyond its reasonable needs and whether the corporation was availed *573 of for tax avoidance purposes are questions of fact. Sections 1.533-1, 1.537-2, Income Tax Regs.; Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 582 (1965). The reasonable needs of a business should be determined by the officers and directors of the corporation. We are reluctant to disturb their business judgment unless the facts and circumstances require us to do so. Raymond I. Smith, Inc. v. Commissioner,292 F.2d 470, 475-476 (9th Cir. 1961); Snow Mfg. Co. v. Commissioner,86 T.C. at 269. In determining whether the corporation has accumulated the earnings and profits of any taxable year beyond the reasonable needs of its business, it is necessary to consider whether accumulated earnings and profits of prior years were sufficient to meet the corporation's reasonable current business needs and reasonably anticipated future needs. Atlantic Properties, Inc. v. Commissioner,62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975). This entails examining the nature and availability of *574 the prior years' accumulated surplus. When a corporation retains its accumulated surplus in the form of liquid assets, such surplus is available to meet business needs. If this surplus meets the current and reasonably anticipated business needs of the corporation, there is a strong indication that any accumulation of profits of the current year is beyond the reasonable needs of the business. Atlantic Properties, Inc. v. Commissioner,62 T.C. at 656, and the cases cited therein.[3]
Section 534 assigns the burden of proof in any Tax Court proceeding involving an allegation of improper corporate accumulation of earnings and profits. [4] The burden of proof may lie with the taxpayer in cases where the Secretary, before mailing the taxpayer a notice of deficiency, notifies the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax. The taxpayer still may place the burden on the Secretary under section 534(c) by timely submitting a statement *575 of the grounds on which the taxpayer relies to establish that the allegation is in error. In this proceeding respondent provided petitioner with such notification; however, petitioner filed no section 534(c) statement in response and consequently bears the burden of proof. Respondent determined petitioner was availed of for the purpose of avoiding shareholder income tax during the taxable year ended June 30, 1981. In support of his determination, respondent contends that petitioner retained earnings and profits for that year in excess of its reasonable business needs. Petitioner argues that it properly accumulated its earnings and profits during the year in issue to provide for the "reasonably anticipated needs," or expansion, of its business. Petitioner alternatively contends that, if the Court should find petitioner accumulated earnings and profits beyond its reasonable needs, it did not do so for the proscribed purpose of tax avoidance. We are not persuaded by petitioner's arguments, as discussed below, and therefore hold for respondent. A. Reasonable Business Needs
1. *576 Expansion
Section 537(a) provides that the "reasonable needs of a business," for purposes of determining the amount of earnings and profits permitted to accumulate, include the "reasonably anticipated needs" of the business. The regulations permit the accumulation of earnings and profits for the expansion of a business where that expansion is a reasonably anticipated need of the business. Section 1.537-2, Income Tax Regs. Petitioner maintains that during the taxable year in issue, the first year of petitioner's retail business, petitioner formulated plans to expand its business, petitioner formulated plans to expand its business into a large store on Ventura Boulevard in the Encino area requiring a capital investment of $ 500,000 or more. Petitioner contends that its expansion plan justified retaining all earnings and profits for the year in issue. Section 1.537-1(B)(1), Income Tax Regs., elucidating the concept of "reasonably anticipated *577 needs," imposes the following requirements on taxpayers that accumulate earnings and profits on the basis of their future needs. (b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.
See also Myron's Enterprises v. United States,548 F.2d 331, 333 (9th Cir. 1977). *578 The specificity requirements were written into the regulations because a loosely run corporation presents a high potential for post-hoc, unsupported rationalizations for the prohibited hoarding of profits. Snow Mfg. Co. v. Commissioner,86 T.C. at 274. The "reasonably anticipated needs" test is a practical one: the projected need must have been a real consideration during the taxable year at issue and not merely an afterthought or belated attempt to justify a challenged accumulation. Snow Mfg. Co. v. Commissioner,86 T.C. at 274; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 332-333 (1968). The critical inquiry here is whether petitioner had specific, definite expansion plans during the taxable year in issue. We recognize that closely held corporations often do not operate with the same formalities as larger corporations; we therefore do not require meticulously drawn, formal blueprints of bona fide plans. Faber Cement Block Co. v. Commissioner,50 T.C. at 332. *579 Although not controlling, subsequent events may be considered to determine whether taxpayer actually intended to consummate the plans for which its earnings and profits were allegedly accumulated. Section 1.537-1(b)(2), Income Tax Regs.; Faber Cement Block Co. v. Commissioner,50 T.C. at 333-334. It is not sufficient, however, for the corporation merely to recognize a future need and discuss possible and alternative solutions concerning the same. Estate of Lucas v. Commissioner,71 T.C. 838, 853 (1979), affd. 657 F.2d 841 (6th Cir. 1981). Specificity and definiteness in planning coupled with action taken toward the consummation of the claimed purpose are essential in finding the accumulation reasonable. Dixie, Inc. v. Commissioner,277 F.2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958); Snow Mfg. Co. v. Commissioner,86 T.C. at 274. Petitioner contends that the occurrence of several events subsequent to the year in issue provides evidence of the development of the "plan" as well as of petitioner's intent to consummate the plan. The cited events, *580 allegedly intermediary steps between the planning stage and the consummation stage, are as follows: (1) the corporation moved its retail operations from Mrs. Wolf's residence to a retail store in the year in issue, and ultimately to an 800 square foot store; (2) petitioner expanded its inventory by adding such lines as clothing and accessories; (3) petitioner associated with Todd to strengthen its inventory of clothing; (4) petitioner began searching a year before the trial for a larger store in which to operate; (5) Mrs. Wolf acquired significant management experience in the process, and (6) petitioner's annual gross receipts increased more than ninefold between the first and sixth years of its retail business. While we believe these are evidence of Mrs. Wolf's business acumen, we are not persuaded that such events are evidence of petitioner's perceived "reasonably anticipated needs" for the year in issue or its intent to consummate the alleged plan. The events to which petitioner refers reflect primarily the growth of petitioner's retail business. [5] Much of petitioner's expansion is attributable to ways not foreseen by petitioner during the tax year in issue, particularly the *581 addition of women's clothing to petitioner's inventory. We also cannot ignore the extent to which petitioner achieved, or failed to achieve, its alleged expansion plan. As of the date of the trial, petitioner had not acquired the large store, or a comparable substitute, referred to in the alleged plan, although inquiries regarding suitable properties were made. Petitioner also had not invested in fixtures or inventory to the extent provided under the alleged plan. Petitioner claims that Mrs. Wolf's retail management and market experience was a precondition to the execution of its plan, yet after 6 years of retail management and market experience and access to substantial liquid assets, the alleged plan remained unfulfilled. Petitioner provides no evidence of any post-taxable year supervening events, such as the unavailability of unique property or the occurrence of unexpected economic conditions, which would make the execution of the expansion, once reasonably anticipated, impracticable. Compare Myron's Enterprises v. United States,548 F.2d at 334 n.5. Thus, we are not convinced that petitioner's activities subsequent to the year in issue are evidence of petitioner's *582 perceived "reasonably anticipated needs" or intent during 1981. Furthermore, we are not satisfied that petitioner formulated specific, definite expansion plans during the year in issue. Petitioner's alleged plan, if in fact formulated as described, exudes uncertainty and vagueness. The uncertainties of the "plan" are clearly expressed in the 1982 letters of Cohen, who wrote as an officer, director, and accountant of petitioner and who described petitioner's plans as then undeveloped. These uncertainties are reflected also in the conflicting testimony of Mrs. Wolf and of Cohen, who respectively described the plan in issue as the operation of one large handbag store and the operation of a chain of small shops. Moreover, both Mrs. Wolf and Cohen were uncertain during the year in issue of the retail operation's future capital requirements. We accordingly conclude that petitioner lacked a "specific, definite *583 and feasible" plan during the year in issue for the use of the funds and that any taxable year accumulation for expansion purposes exceeded the reasonably anticipated needs of the business for that year.
2. Working Capital Needs
The retention of earnings and profits as a source of working capital is reasonable where a need for such working capital exists. Section 1.537-2(b)(4), Income Tax Regs. Petitioner concedes on brief that it does not rely on its working capital needs as a ground for justifying its accumulation of earnings and profits in the taxable year in issue. Consequently, we need not discuss the merits of respondent's argument that petitioner's accumulations from previous years were sufficient to meet its working capital needs, as computed under the Bardahl formula, [6] for the taxable year at issue. Nor need we discuss the merits of petitioner's reply argument that the Bardahl formula is inapplicable to a corporation whose business is in a state of transition. *584 Despite its concession, petitioner argues that, if its working capital needs were computed under the Bardahl formula, its working capital needs during the year in issue would amount to approximately $ 44,500 to $ 89,000. Petitioner provides no other estimates of its working capital needs. We do not accept these figures, which exceed even the annual operating costs of petitioner in the taxable year. Moreover, the issue of whether petitioner properly determined its working capital needs is moot, because petitioner' prior accumulations substantially exceeded petitioner's highest estimate of its working capital needs during the year in issue. Therefore, we conclude that petitioner did not need to retain earnings and profits during the year in issue as a source of working capital. B. Purpose
In the alternative to its first argument, petitioner argues that if it permitted its earnings and profits to accumulate beyond its reasonable needs, it did not do so for the proscribed purpose of shareholder tax avoidance. Mrs. Wolf and Cohen each testified that tax avoidance was never a consideration in petitioner's decision to accumulate its earnings and profits during the taxable *585 year in issue. While these declarations are entitled to some weight, they are not conclusive and the Court must resolve the issue in light of the attendant circumstances. Pelton Steel Casting Co. v. Commissioner,28 T.C. 153, 173-174 (1957), affd. 251 F.2d 278 (7th Cir. 1958). We find that the evidence corroborates, rather than disproves, respondent's determination of petitioner's purposeful avoidance of income tax. Petitioner made a $ 7,500 loan to Mrs. Wolf during the year is issue. Dealings between the corporation and its shareholders, including loans to shareholders, may indicate tax avoidance intent. Section 1.533-1(a)(2), Income Tax Regs. Petitioner disputes such an inference, without citing any authority, on the grounds that petitioner made no other loans to its shareholder throughout its existence, that the loan amount was insignificant, and that the loan was merely a temporary convenience to Mrs. Wolf. Although we find no evidence in the record of additional shareholder loans, we are not persuaded by petitioner's *586 assertions. In reaching this conclusion, we observe that the borrower herein was the sole shareholder, that the loan coincided with the year in issue, that the loan was not accompanied by a promissory note, that the loan was interest free, and that Mrs. Wolf used the proceeds for personal purposes. We do not find the amount of the loan insignificant, particularly when compared to the salary and dividends which petitioner paid Mrs. Wolf as manager-owner during the year in issue, or $ 12,000 and $ 0 respectively. We do not believe the loan was merely a temporary convenience, because Mrs. Wolf waited between 2 and 4 years to repay it. We believe that the terms of the loan and circumstances surrounding it indicate petitioner's intent to provide Mrs. Wolf the benefits of a dividend without the resulting tax liability. Petitioner paid no dividends to its shareholders during its 32 years of corporate existence except in 1983, 2 fiscal years after the year in issue. A poor or nonexistent dividend payment history, unjustified by reasonable business needs, is another indication of the proscribed *587 intent. Section 1.553-1(a)(2), Income Tax Regs.; Snow Mfg. Co. v. Commissioner,86 T.C. at 281. Petitioner attributes its historical failure to pay dividends to its alleged perceptions that until 1977 it had inadequate earnings and profits, and that from 1977 through the year in issue it needed additional liquidity for a future investment in a new business. We do accept petitioner's blanket explanation for its failure to pay dividends during the 23-year period ending in 1977, particularly during such lucrative years as 1974 through 1977, when petitioner's retained earnings jumped from $ 137,078 to $ 253,158. Even if we accept this explanation, however, we cannot accept petitioner's explanation for the years 1977 through 1981, because we are not persuaded that petitioner perceived with any certainty a reasonably anticipated business need to accumulate additional earnings and profits. Petitioner had no apparent dividend payment policy before or during the year in issue. Despite petitioner's operating loss in the retail aspect of its business during the year in issue, petitioner's high liquidity and ample passive income afforded it the *588 opportunity to pay a dividend during that year. Another indication of the proscribed intent is present in this case. Petitioner retained between 1977 and the year in issue large, idle amounts of cash and certificates of deposit, in spite of relatively minimal expenses and liabilities. The inactive employment of corporate earnings and the retention of large cash balances in excess of the amount needed may indicate the intent to avoid shareholder taxation. Oyster Shell Products Corp. v. Commissioner,313 F.2d 449, 454 (2d Cir. 1963), affg. a Memorandum Opinion of this Court; Barrow Mfg. Co. v. Commissioner,294 F.2d 79, 81-82 (5th Cir. 1961), affg. a Memorandum Opinion of this Court. Petitioner fails to explain adequately the presence of this factor. We find petitioner's retention of cash and certificates of deposit is evidence of its proscribed intent. Petitioner argues that if tax avoidance had been a motive, petitioner would have made distributions to Mrs. Wolf, not in the year in issue, but in earlier years such as 1976 and 1977, when she *589 had little or no other tax liability. We are not convinced by this argument, because such years appear isolated and petitioner fails to prove that a distribution of petitioner's earnings in those years would not have significantly increased her tax liability. Finally, petitioner contends its case is factually analogous to New England Wooden Ware Corp. v. United States,289 F. Supp. 111 (D. Mass. 1968). In that case the district court held that an unprofitable wooden pail manufacturer, which faced impending liquidation, properly accumulated earnings and profits for the purpose of entering another line of business. We are neither bound nor persuaded by petitioner's reliance on New England Wooden Ware Corp., which is factually distinguishable from the case before us. In New England Wooden Ware Corp., the taxpayer had clear and ample documentation regarding its dividend payment and expansion policies, both before and after the years in issue. The documentation included correspondence, minutes of Director's meetings, and feasibility and market studies. During the 3 years in issue, the taxpayer's combined dividends amounted to more than one-third of the *590 combined amount of earnings available for distribution during those years. The taxpayer justified its accumulation of the remaining funds on the perceived necessity to provide for changes in technology and consumer demand and for the industry's strong national competition and large economies of scale. Conversely, in the case before us, petitioner's dividend policy was virtually nonexistent through the year in issue, and it did not formulate before or during the year in issue the intent to expand to an extent that would justify additional accumulations of earnings. We conclude that petitioner has not rebutted the statutory presumption, because its financial position at the beginning of and during the year in question was adequate to meets its business needs, both immediate and anticipated. Furthermore, we hold that during the taxable year in issue, petitioner was availed of for the proscribed purpose of income tax avoidance under section 532 and is thus liable for the section 531 tax, as computed by respondent. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the year in issue, except as otherwise noted. ↩
2. Section 534 provides in pertinent part as follows: SEC. 534. Burden of Proof. (a) General Rule. -- In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegations shall -- (1) if notification has not been sent in accordance with subsection (b), be on the Secretary, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. -- Before mailing the notice of deficiency referred to in subsection (a), the Secretary may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. (c) Statement by Taxpayer. -- Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. ↩
3. See also Rutter v. Commissioner,T.C. Memo. 1986-407↩. 4. See supra n.2; section 1.534-2, Income Tax Regs.↩
5. We note that financial data comparisons, such as annual gross sales comparisons, between petitioner's first and sixth years of retail operation are somewhat deceptive, because petitioner operated its retail business only half of its first fiscal year in that business. ↩
6. Bardahl Mfg. Corp. v. Commissioner,T.C. Memo. 1965-200; Rutter v. Commissioner,T.C. Memo. 1986-407↩. See generally, B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.03, at 8-18 through 8-20 (4th ed. 1979).