KAMINSKY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Kaminsky, Inc. v. Commissioner
Docket No. 17214-88
United States Tax Court
T.C. Memo 1990-491; 1990 Tax Ct. Memo LEXIS 543; 60 T.C.M. (CCH) 740; T.C.M. (RIA) 90491; September 12, 1990, Filed *543 Decision will be entered for the petitioner. Kevin M. Hinkel and Joseph P. Alexander, for the petitioner. Jack E. Prestrud, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 93,965 in petitioner's Federal income tax for 1982. The issue for decision is whether petitioner is liable for the accumulated earnings tax imposed by section 531. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner *546 is an Ohio corporation whose principal place of business at all relevant times, including the date its petition was filed, was Brunswick, Ohio. It was incorporated in December 1979, as part of a plan to consolidate three then-existing Ohio corporations -- Kaminsky Brunswick, Inc., Kaminsky Medina, Inc., and Kaminsky Strongsville, Inc., each of which operated a McDonald's franchise restaurant (sometimes referred to as restaurants or stores). Paul Kaminsky is petitioner's controlling shareholder, owning approximately 79 percent of its stock. The remaining 21 percent of petitioner's stock is owned equally by his wife, Betty Kaminsky, and son, Michael Kaminsky. Michael Kaminsky has at all relevant times been responsible for the day-to-day operations of petitioner's restaurants. In 1982, petitioner operated the following four McDonald's franchise restaurants: Location
Opened
Brunswick, Ohio
1969
Medina, Ohio
1974
Strongsville, Ohio
1975
North Royalton, Ohio
1980
Kaminsky Management Company (Management) is an Ohio corporation incorporated in 1975; its stock is owned by Paul Kaminsky, his wife and son. It provides management, financial, accounting, administration, *547 personnel, and other business services to petitioner (including providing managers for the day-to-day handling of petitioner's stores) under a written agreement; as compensation for services rendered, Management receives a percentage of petitioner's gross receipts, plus reimbursement for the salaries it pays to the stores' managers. On February 5, 1987, respondent notified petitioner, pursuant to section 534(b), that it proposed to issue a notice of deficiency based upon the imposition of the accumulated earnings tax for 1982. By letter dated April 3, 1987, petitioner submitted a statement (pursuant to section 534(c)) of the grounds on which it relied to establish that no part of its earnings was accumulated beyond the reasonable needs of its business with respect to 1982. The statement identified the following three grounds as a basis for the accumulation: (1) expansion of petitioner's business operations through the acquisition of new franchises; (2) expansion of business operations through the purchase of existing franchises; and (3) renovation and upgrades of existing restaurants. In a motion filed February 6, 1989, petitioner requested a ruling on the burden of proof under *548 section 534(a)(2). We granted petitioner's motion and determined that respondent has the burden of proof with respect to the first and third grounds. We further determined that petitioner has the burden of proof with respect to the second ground. Expansion Plans
In 1978-1979, Paul and Michael Kaminsky "envisioned a six store plan." By expanding to six restaurants, they believed petitioner could achieve efficiency of size, establish separate maintenance and training departments, and keep their store managers motivated by the potential for advancement. In this regard, in 1978, they negotiated and attempted to purchase an existing franchise for a McDonald's restaurant in Wadsworth, Ohio, from Jack Schoaf; the negotiated purchase price was $ 380,000. Mr. Schoaf, however, sold the Wadsworth restaurant to Joe Bendon. In 1979, the Kaminskys targeted a site at the intersection of Interstate 71 and Route 18 as a potential expansion location. However, a McDonald's franchise for such location was awarded to Mr. Bendon. (McDonald's Corporation had determined that Mr. Bendon was in a better position for expansion because he had kept his restaurants more physically up to date than *549 petitioner's predecessors.) The loss of a McDonald's franchise at the Interstate 71/Route 18 location resulted in petitioner's losing three managers who had been promised reassignment to the anticipated new restaurant. Disappointed over losing the interstate 71/Route 18 location, Paul Kaminsky became determined not to lose another potential location. He realized that from McDonald's viewpoint reinvestment in the physical facilities of existing restaurants was critical to future expansion considerations. Petitioner then identified the intersection of Interstate 71 and Route 303 (which is approximately 2-1/2 miles from petitioner's Brunswick store) as a possible location for a new restaurant. In 1980 or 1981, Paul Kaminsky and Thomas Fewster, McDonald's regional manager for the Cleveland, Ohio region, discussed expansion of petitioner's operations to the Interstate 71/Route 303 site and viewed potential sites at that location. Following such discussions, Kaminsky believed that petitioner had a good chance of being awarded the location. To avoid luring customers away from the existing Brunswick store, petitioner determined that it would construct a highway store at the location *550 because McDonald's had determined that highway stores typically derive approximately 65 percent of their business from highway traffic. (A McDonald's highway restaurant is usually one-third larger than the typical McDonald's restaurant and has larger restrooms and more landscaping.) Consequently, petitioner decided to concentrate on highway site locations to discourage Brunswick residents from leaving the Brunswick store. In 1982, petitioner projected construction costs for a highway store to be approximately $ 500,000. (In 1982, the average cost for the construction of a new nonhighway McDonald's restaurant was approximately $ 360,000.) Petitioner determined that there were two available sites at the Interstate 71/Route 303 location which would support a highway store: the Dravo-Marks property and the K-Mart property. As any location which petitioner selected would require McDonald's approval, and since petitioner did not know which site would be acceptable to McDonald's, petitioner decided to acquire both sites. Although there was no guarantee that petitioner would be awarded a McDonald's franchise at either location, the Kaminskys decided to accept the risk involved from such *551 an aggressive undertaking in order to gain a competitive edge over other potential franchisees. The Dravo-Marks property consisted of 6.5 acres and the K-Mart property was 10.6 acres. Petitioner, based upon land prices in the immediate vicinity, believed that the sites under consideration would cost $ 30,000-$ 35,000 per acre. Although McDonald's would purchase only 4 acres if the site were selected for a new restaurant, the Kaminskys anticipated that petitioner would have to acquire the parcels in their entirety in order to induce a sale from the owners. Because of its easier access and better frontage on Route 303, petitioner preferred the Dravo-Marks property and purchased it for $ 196,380 in 1983. Nevertheless, McDonald's rejected the site as a potential location. In March 1985, petitioner acquired the K-Mart property for approximately $ 219,000 in cash, which location was subsequently approved by McDonald's. Petitioner began construction at the purchased site but encountered problems in obtaining a necessary access easement and zoning variances as well as litigation, all of which delayed construction of the restaurant. The construction of the restaurant was nearing completion *552 as of the date of trial (April 1989). In 1981, the owner of a McDonald's restaurant at the intersection of Routes 8 and 82 approached Paul Kaminsky and requested that he make an offer to purchase the restaurant. Paul and Michael Kaminsky visited the restaurant several times and determined that it was within an acceptable distance (as measured by driving time) from their existing locations. Thereafter, Paul Kaminsky contacted Tom Doran, a McDonald's regional manager, concerning petitioner's interest in the Routes 8/82 location. Mr. Doran advised the Kaminskys to cease their pursuit of the acquisition. Prior to 1982, Paul Kaminsky discussed the purchase of the restaurant at the intersection of Interstate 71 and Route 18 with Mr. Bendon, its owner. He made an offer to buy it for $ 1 million, but the offer was rejected. The Kaminskys were aware that the purchase price of an existing McDonald's restaurant was customarily based upon a percentage of that restaurant's trailing 12-month gross sales volume. During 1982, the percentages applicable in petitioner's region ranged from 50 percent to 80 percent. Thus, in 1982, petitioner projected an expenditure of between $ 500,000 to *553 $ 1,000,000 for the purchase of an existing franchise. Renovations and Upgrades - In General
McDonald's established a policy that its franchisees were to renovate seating and decor every five to seven years. Through reinvestment, a franchisee would be able to fulfill the McDonald's philosophy of having state of the art restaurants. Such reinvestment would be evaluated favorably not only for purposes of renewal of the existing franchise location, but also for expansion purposes. In addition to seating and decor, equipment changes and upgrades and menu changes proved to be a recurring expense for franchisees. In 1982, petitioner projected a cost of $ 30,000 per store to meet the need for changes in equipment and menu. Renovations
In 1980, Paul Kaminsky and Mr. Fewster discussed the fact that the Brunswick store (built in 1969) was in need of renovation. Shortly after it was built, the Brunswick store had $ 400,000 in sales volume. By 1980, sales had exceeded $ 1 million. Petitioner estimated that the renovation would cost $ 550,000 given the extensive work that had to be done. Following several delays, construction was completed in July 1986, at a cost of approximately *554 $ 580,000. Upon completion, all that remained of the original building was the front wall and window. In the early 1980's, petitioner planned to expand the seating capacity at its Strongsville restaurant by constructing an atrium. The restaurant was also in need of an updated decor. Petitioner estimated the cost of these upgrades to be $ 300,000. The construction for the renovation was completed in July 1984, at a cost of $ 289,235. Upgrade: Playlands
McDonald's sponsors annual conventions. McDonald's often introduces at these conventions new concepts for franchisees to adopt. In 1980 or 1981, Michael Kaminsky attended a convention at which McDonald's promoted the playland concept. The playland concept involved setting aside an area of a restaurant and equipping it with slides, tunnels, and other amusements to attract customers with young children. Petitioner determined that, consistent with McDonald's philosophy, a playland would be a good way of differentiating its restaurants from those of its competitors. Although it was decided to install playlands at all four restaurants, petitioner was not content with the existing design; consequently, Paul and Michael Kaminsky *555 and a McDonald's field representative travelled to Columbus, Ohio, to examine playlands that were in actual use. It was estimated that playlands would cost between $ 35,000 and $ 40,000 per store. In 1982, petitioner was informed that city authorization for the Strongsville restaurant playland would be denied. Due to zoning problems in 1983, the plans to install a playland at the Brunswick restaurant were rejected. Playlands were installed at the Medina and North Royalton locations in 1983 at a total cost of $ 54,189 and $ 64,856, respectively. Upgrade: Computer Registers
During the late 1970's, petitioner recognized the need to install computerized cash registers and installed a test register at one restaurant. The test register proved to be a failure. During 1982, McDonald's was working with Panasonic to develop a reliable register for use in its restaurants. Following a successful test of the Panasonic register, in 1982, petitioner decided to purchase computerized registers for each of its four locations. The estimated cost was $ 25,000 to $ 30,000 per store. In 1983, petitioner acquired computerized registers for its Brunswick, Medina, North Royalton, and Strongsville *556 stores at the respective costs of $ 26,989, $ 23,024, $ 17,789, and $ 23,220. Upgrade: Cash Booths
A typical McDonald's restaurant derives 45 percent to 48 percent of its business from drive-through window sales. Petitioner's restaurants exceeded this percentage, deriving between 50 percent to 52 percent of its business from such sales. Prior to 1980, a typical McDonald's restaurant would collect money and deliver food at the same drive-through window. Michael Kaminsky learned that McDonald's was promoting the concept of cash booths for its restaurants at a convention he attended in the early 1980's. A cash booth is a separate window (situated before the drive-through food window) where the money is collected from customers. Petitioner decided to install cash booths at its four restaurants but wanted to improve on the basic design by installing a walkway between the cash booth and the food window. Petitioner estimated its cost to be $ 25,000 to $ 40,000 per restaurant. The year of installation of the cash booths and actual installation costs were: Location
Year of Installation
Cost
North Royalton
1984
$ 14,848
Medina
1985
$ 40,239
Strongsville
1985
$ 25,573
*557 Land Acquisition
McDonald's Corporation has had a long standing recommendation to its franchisees that they acquire real estate adjoining their restaurants to provide for future parking needs. In 1981, Michael Kaminsky met with the mayor of Strongsville to discuss the prospects of rezoning three residential houses located next to the Strongsville restaurant in the event petitioner was able to purchase the homes. As a result of the meeting, Michael Kaminsky believed that the rezoning to commercial use could be accomplished. Based upon sales prices in the area, petitioner estimated that the three homes could be acquired for $ 60,000 each. Petitioner was able to acquire one of the homes in June 1983 for $ 66,000. Shortly after this purchase, Michael Kaminsky attended a financial seminar sponsored by McDonald's. At the seminar, franchisees were advised to have assets in their management companies. As a result of the seminar, in December 1983, petitioner transferred the house to Management at a price of $ 66,000. In September 1987, Management purchased the second of the three homes originally targeted for purchase at a price of $ 51,000. Prior to 1983, the Brunswick and *558 North Royalton restaurants were also in need of land for expanded parking. Petitioner planned to acquire approximately one acre behind the Brunswick store for $ 10,000 and to purchase the lot next to the North Royalton restaurant. After discussions with the mayor of North Royalton, petitioner estimated that the lot would cost $ 1,200 per front foot, resulting in a total price of $ 100,000. Sometime after 1982, petitioner acquired the land behind the Brunswick store. Paul and Betty Kaminsky purchased the lot next to the North Royalton restaurant in February 1986 for approximately $ 120,000. Investments
In 1978, petitioner (through a predecessor corporation) acquired a 50-percent general partnership interest in Golden Villas Ltd. (Golden Villas), an Ohio limited partnership. Petitioner initially invested $ 102,000 and from 1979 through 1981 made additional investments totaling $ 285,000. The total investment in Golden Villas was $ 387,000. Melvin Gerspacher, a local real estate developer with whom the Kaminskys had previously made several other personal investments, promoted the Golden Villas project, an apartment complex catering to the needs of retiree tenants. The *559 apartment complex was in close proximity to one of petitioner's restaurants. During the early 1980's, Michael Kaminsky negotiated with Mr. Gerspacher for the sale of petitioner's partnership interest in Golden Villas. Petitioner eventually sold its partnership in Golden Villas to Mr. Gerspacher in March 1983 for $ 398,225 in cash. After providing for a reserve for taxes and a loan payoff, petitioner distributed the net proceeds from the sale ($ 226,000) as a cash dividend in April 1983. Financial Information
Petitioner's operations, including those of its predecessor corporations, have been quite profitable. From 1979 through 1982, its reported taxable income was: 1979
$ 301,216
1980
$ 387,864
1981
$ 397,171
1982
$ 546,709
As of December 31, 1980, petitioner's accumulated earnings and profits were $ 1,588,823; however, it declared and paid minimal dividends: 1979
$  1,000
1980
$ 10,000
1981
$    100
1982
$ 25,000
As of December 31, 1982, petitioner's net current assets were $ 1,460,972 (petitioner posits its net current assets should not include the value of its partnership interest in Golden Villas; thus, according *560 to petitioner, its net current assets as of December 31, 1982 were $ 1,073,972). ULTIMATE FINDINGS OF FACT 1. During 1982, petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs, including reasonably anticipated needs, of its business. 2. Under section 535(c)(1), petitioner is entitled to an accumulated earnings credit for 1982 equal to its undistributed taxable income for that year. OPINION A corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed, is subject to the accumulated earnings tax imposed by section 531. Sec. 532(a). The accumulated earnings tax is a means of discouraging the accumulation of corporate earnings not needed in the conduct of a business. Ivan Allen Co. v. United States, 422 U.S. 617, 624 (1975). The tax, considered a penalty, is strictly construed. Ivan Allen Co. v. United States, supra at 626. *561 For the accumulated earnings tax to apply, tax avoidance need not be the sole or even the dominant purpose for the accumulation. Shareholder tax avoidance may be only one of several purposes. United States v. Donruss Co., 393 U.S. 297, 307-309 (1969). The subjective inquiry, i.e., whether the corporation was formed or availed of for the proscribed purpose, is made with respect to the state of mind of those who control the corporation. Helvering v. National Grocery Co., 304 U.S. 282, 292-294 (1938); Bahan Textile Machinery Co. v. United States, 453 F.2d 1100, 1101 (4th Cir. 1972). Section 533(a) establishes the presumption that a corporation with earnings and profits accumulated beyond the reasonable needs of its business was formed or availed of for the proscribed purpose. The presumption is rebuttable, however, if the corporation proves, by the preponderance of the evidence, to the contrary. Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986); Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 580 (1965). *562 The Commissioner bears the burden of proof as to whether an accumulation of earnings and profits is unreasonable if the taxpayer submits a statement of the grounds on which he relies and sufficient facts to support such grounds to establish that all or any part of the earnings and profits have not been allowed to accumulate beyond the reasonable needs of the business. Sec. 534(a) and (c). (On April 3, 1987, petitioner submitted a statement to respondent pursuant to section 534(c). In an Order dated March 23, 1989, we found that petitioner's statement sufficiently set forth facts which, if proven, would support the alleged business needs for petitioner's accumulation of earnings and profits with respect to (1) expansion of its business operations through the acquisition of new franchises, and (2) renovations and upgrading of existing restaurants. Thus, respondent bears the burden of proof with respect to these grounds.) The accumulated earnings tax is not imposed where a corporation has accumulated *563 its earnings beyond the reasonable needs of its business but lacks the proscribed purpose. Snow Manufacturing Co. v. Commissioner, 86 T.C. at 269; Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153, 173 (1957), affd. 251 F.2d 278 (7th Cir. 1958). Furthermore, if it is determined that the corporation was formed or availed of for the proscribed purpose, the tax is applied only to that portion of the corporation's earnings and profits which exceeds the corporation's reasonable needs. Sec. 535(a) and (c). Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. at 580-581; John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 465 (1965). Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable business needs and whether the corporation was availed of for tax avoidance purposes are both questions of fact. Helvering v. National Grocery Co., supra; Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. at 582. We are reluctant *564 to substitute our business judgment for that of the corporate officers and directors who usually determine the reasonable needs of a business. Snow Manufacturing Co. v. Commissioner, 86 T.C. at 269; Atlantic Properties, Inc. v. Commissioner, 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975); Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 329 (1968). In cases such as this one, where accumulated earnings and profits exceed net liquid or current assets, in determining whether earnings and profits have accumulated beyond the reasonable needs of the business, the critical factor for examination is the corporation's liquid position and the relation of that position to current and anticipated needs. Hughes, Inc. v. Commissioner, 90 T.C. 1, 19-20 (1988); Faber Cement Block Co. v. Commissioner, supra at 329. The parties do not dispute that in determining whether petitioner accumulated its earnings and profits beyond the reasonable needs of its business, the net liquid assets of petitioner must be compared to its business needs. The parties, however, disagree (1) *565 with respect to the classification of the Golden Villas partnership interest as a liquid asset, and (2) with respect to the reasonable needs of the business. Petitioner argues that its net liquid assets are $ 1,073,972 and respondent claims the figure should be $ 1,460,972, based upon the inclusion of the Golden Villas partnership interest at its original cost. Petitioner contends that such partnership interest should be excluded from treatment as a liquid asset because it was related to its business and was not readily marketable. In our opinion, the nexus between the partnership interest and petitioner's business is too tenuous to properly treat such interest as a business asset. We therefore find that the investment in Golden Villas, though illiquid, was not held for business purposes. Accordingly, in deciding whether petitioner accumulated its earnings and profits beyond the reasonable needs of the business, we will compare those needs against a net liquid assets figure of $ 1,460,972. We now consider petitioner's reasonable business needs. The reasonable needs of a business *566 include reasonably anticipated needs. Sec. 537(a)(1). Petitioner was in need of funds to expand its business operations. Accumulating earnings for bona fide business expansion is recognized as a reasonable business need. Snow Manufacturing Co. v. Commissioner, 86 T.C. at 273; sec. 1.537-2(b)(1), Income Tax Regs.
In furtherance of its expansion plans, petitioner sought out the award of the Interstate 71/Route 303 location. Believing that it had a good chance of obtaining that location, petitioner embarked on an aggressive course of action, identifying two available parcels (the Dravo-Marks property and the K-Mart property) at such location and retaining funds for their eventual purchase. Although we are mindful that petitioner had no way of knowing which, if any, of the two locations McDonald's would find acceptable, we conclude that petitioner had a reasonable need to accumulate funds for the purchase of one parcel. Since petitioner believed the Dravo-Marks property was the preferable location and acquired it first, it was reasonable to accumulate $ 227,500 (6.5 acres X $ 35,000 per acre) for such purchase. Moreover, we are satisfied *567 that it was reasonable for petitioner to accumulate $ 500,000 for the construction of the restaurant at the Interstate 71/Route 303 location. The record here amply demonstrates that such restaurant was planned to be a highway store which is larger than a typical McDonald's restaurant and is more costly to build. Consequently, respondent has failed to meet his burden of proof as to these items under our section 534(c) order. In addition to maintaining expansion plans through the acquisition of new locations, petitioner planned to expand through the acquisition of existing locations. We are persuaded that petitioner planned for both methods of expansion in order to achieve its goal of a six store operation. Petitioner identified three specific instances of negotiations for the acquisition of existing restaurants. It was well aware that existing restaurants were selling for 50 to 80 percent of the trailing twelve months sales volume. The fact that the purchase of an existing restaurant did not occur is not determinative with respect to the existence of such plans. Sec. 1.537-1(b)(2), Income Tax Regs. Paul Kaminsky, whose testimony we found credible, *568 anticipated that an acquisition by purchase of an existing restaurant would be in the $ 500,000 to $ 1,000,000 range. Accordingly, we hold that petitioner has met its burden of proof in showing an accumulation within such range to be a reasonable business need. We now examine petitioner's plans to maintain and upgrade its existing stores, bearing in mind that respondent bears the burden of proof with respect to these items. Petitioner was keenly aware of McDonald's philosophy of modernization to achieve state of the art in facility design and equipment. The Brunswick store, petitioner's oldest, was in need of major renovation. Its sales volume more than doubled from its original level in 1969. We find it a reasonable need of petitioner's business to accumulate $ 550,000 for the renovation. Although petitioner experienced construction delays which were beyond its control, it did in fact implement the renovation as previously planned. In 1982, petitioner had plans to update the decor and expand the seating capacity at its Strongsville location. We conclude that it was reasonable to accumulate $ 300,000 for such purpose. In July 1984, the renovation at the Strongsville restaurant *569 was completed at a cost of $ 289,235. At the end of 1982, petitioner planned to install Panasonic computer cash registers at its four locations. The estimated cost per store was $ 30,000. Accordingly, we find that it was reasonable for petitioner to accumulate $ 120,000 (4 stores X $ 30,000) to meet its business needs. In 1983, such registers were actually purchased for each store at a total cost of $ 91,000. After its officers attended a McDonald's convention and traveled to Columbus, Ohio, petitioner determined that it would install playlands at its restaurants; however, sometime prior to the end of 1982, petitioner was aware that it could not have a playland at its Strongsville restaurant. The estimated cost of installing a playland was $ 40,000 per store. We conclude that it was a reasonable need of petitioner's business to accumulate $ 120,000 in 1982 (3 stores X $ 40,000) for the installation of playlands at three of its four restaurants. During the early 1980's, McDonald's introduced the cash booth concept as a way of increasing sales volume by reducing the waiting time at the drive-through window. Because at least 50 percent of petitioner's sales were derived from *570 the drive-through, it planned to install cash booths at its four locations at an estimated cost of $ 25,000 to $ 40,000 per store. We believe that petitioner had a reasonable business need to accumulate earnings in 1982 for the installation of cash booths at its restaurants. We further believe that the cost of one cash booth has already been reflected in the accumulation for the Brunswick store renovation. Therefore, to avoid double counting, we find that the amount of the accumulation for cash booths is $ 75,000 to $ 120,000 (3 stores X $ 25,000 to $ 40,000). Cash booths were actually constructed at three of petitioner's stores during 1984-1985. For completeness, we note that petitioner has shown the existence of additional reasonable and reasonably anticipated needs; however, while petitioner has justified the need for accumulating further amounts, we find it unnecessary to go on in order to avoid "running up the score." Respondent argues that petitioner's accumulations were beyond its reasonable needs because it did not have specific, definite, and feasible plans for the accumulations as required by section 1.537-1(b)(1), Income Tax Regs. If the *571 test was solely whether formal plans were documented in the corporate minute book, we would agree with respondent. However, such is not the test and closely held corporations, such as petitioner, have not been held to the same strict standards as publicly held corporations. Doug-Long, Inc. v. Commissioner, 72 T.C. 158, 171 (1979); John P. Scripps Newspapers v. Commissioner, 44 T.C. at 469. Based on the record as a whole, we conclude that the absence of specific statements in its corporate minutes is not fatal to petitioner. We believe petitioner was firmly committed to a planned course of action which was manifested by action within a reasonable period of time. In view of the fact that petitioner's reasonable business needs exceeded its net current assets, we hold that petitioner did not accumulate its earnings beyond the reasonable needs of its business. Because the credit provided for in section 535(c)(1) would be equal to the full amount of retained earnings, the accumulated taxable income, on which the section 531 tax is imposed, would be zero and petitioner would owe no section 531 tax. Such being the case, we need not consider whether *572 the proscribed purpose of avoiding income tax may have existed. Magic Mart, Inc. v. Commissioner, 51 T.C. 775, 799 (1969). Decision will be entered for the petitioner. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩